**WHEELS SPORTS GROUP, INC., Plaintiff,**

v.

**SOLAR COMMUNICATIONS, INC., Defendant.**

No. 1:97CV00937.

United States District Court, M.D. North Carolina.

Aug. 5, 1999.

Daniel Alan M. Ruley, William Kearns Davis, Bell, Davis & Pitt, P.A., Winston–Salem, NC, Henry P. Van Hoy, II, Martin Van Hoy Smith & Raisbeck, LLP, Mocksville, NC, for Wheels Sports Group, Inc., plaintiff.

Elizabeth Danielle Thompson, Kilpatrick Stockton, L.L.P., Daniel R. Taylor, Jr., Kilpatrick Stockton, L.L.P., William Mark Conger, Kilpatrick Stockton, L.L.P., Winston–

Salem, NC, Donald G. Mulack, McBride Baker & Coles, Chicago, IL, for Solar Communications, Inc., defendant.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This matter comes before the court following a bench trial which concluded on January 25, 1999. This action arises out of a contract dispute between Plaintiff Wheels Sports Group, Inc. ("Wheels") and Defendant Solar Communications, Inc. ("Solar"). At trial the parties presented both witnesses and exhibits, as well as deposition testimony, for the court's consideration. After careful review of the exhibits, depositions, and testimony of the witnesses, including the witnesses' demeanor, opportunity to acquire knowledge of the facts about which they testified, and interest in the case, as well as the parties' post-trial submissions, the court makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure. Based on these findings and conclusions, the court will enter judgment for Defendant.

## FINDINGS OF FACT

### A. *The Parties*

1. Plaintiff Wheels was a North Carolina corporation with its principal place of business located in Mocksville, North Carolina. Wheels was engaged in the business of designing and marketing motor sports trading cards and other accessories. During the course of this litigation, Wheels merged with Racing Champions, an Illinois corporation, and is now known as Racing Champions South.

2. Defendant Solar is an Illinois corporation with its principal place of business located in Naperville, Illinois. Solar is engaged in the business of cutting, collating, and packaging trading cards for manufacturers.

### B. *Background and Claims*

3. Plaintiff Wheels brought this action originally in the General Court of Justice, Superior Court Division, Davie County, North Carolina, on August 7, 1997. Defendant Solar subsequently removed the action to this court on the basis of diversity jurisdiction. Plaintiff's complaint is founded on common law contract principles and presents the theory that by failing to collate the Crown Jewels Elite and Race Sharks trading card projects in a reasonable fashion Defendant breached the parties' agreements.

### C. *The Parties' Dealings Prior to the Crown Jewels Elite and Race Sharks Projects*

4. The relationship between the parties began in 1993, when Wheels secured the services of Solar on a project called "Rookie Thunder." This project represented Wheels' fourth motor sports trading card product, but it was a much larger product than the first three. It totaled approximately 21,600,000 cards comprising 8,000 cases of cards, and it represented Wheels' first full-set trading card product. On the Rookie Thunder project, Solar agreed to cut, collate, and package the cards.

5. Wheels provided Solar with sheets containing 100 trading cards, which Solar cut into single cards. The individual cards then were placed in a collating machine which mixed and packaged nine cards per pack. The packs were then placed into boxes, with thirty packs to the box. Finally, boxes were placed into cases, with each case containing ten boxes.

6. The foundation of most trading card products is a base set of cards, a set which may include as many eighty different cards, each with a picture of a different sports figure on it. When a consumer opens up a pack, he or she is most likely to receive a selection of base cards. Most products also include smaller sets of insert or chase cards, which may include as many as ten or fifteen different cards or as few as one card. These cards are more rare than base cards and are often designed with an appealing enhancement, and thus they generally are more desirable to card collectors.[1] Trading card

---

1. Enhancements used by Wheels include viper skin, crocodile skin, shark teeth, and gemstones attached to the insert cards.

packs and display boxes typically present to the consumer the odds of receiving in a given pack an insert card from any of the various insert sets. Like almost every other card manufacturer, however, Wheels also includes a disclaimer with the ratios which states that "[s]tated odds are an average for the entire production run and are not guaranteed within an individual pack or box."[2]

7. In the trading card packaging industry "collation" refers to the placement of the cards within the production run. It is important that the packager mix and collate the cards such that the distribution of the insert cards throughout the production run approximates the ratios advertised on the packs and boxes. Solar employees conceded at trial that they would "strive" to meet the stated odds on all Wheels projects. For example, if an insert set in Rookie Thunder included only one card, and the odds of receiving that card in a given pack were 1 in 300, then there should have been one card in every ten boxes (thirty packs per box) and one card in every case (ten boxes per case). Thus, if the production run included 8,000 cases there should be 8,000 duplicates of this particular card. Although concentrating all 8,000 duplicates in four cases would meet the stated odds over the entire production run, such a distribution would represent poor collation. "Clustering" describes a collation pattern where a particular card appears multiple times within a box or case.

8. The Rookie Thunder project was plagued by card-cutting problems. These problems eventually led to a dispute between the parties, which concluded when Solar agreed to pay Wheels a sum of money and to issue it credits on future jobs together totaling over $600,000.00. The quote sheets used by Solar include reverse side terms entitled "Printing Trade Customs," terms which are standard in the printing industry. These terms limit Solar's liability to the extent of the invoice owed to Solar and require that notice of defective performance be given to Solar within thirty days of delivery. The quote sheet signed by Wheels for the Rookie Thunder project had been faxed, and Dan

Correll of Wheels informed Peter Hudetz of Solar that he had never seen the reverse side terms. For this reason, Solar did not attempt to limit its liability for the cutting problems or to enforce the notice requirement contained in the Printing Trade Customs, and thus paid sums to Wheels far in excess of the invoice owed to Solar for the Rookie Thunder project.

9. Because of the significant exposure to liability Solar faced on the Rookie Thunder project, Hudetz made it clear to Correll that Solar would do business with Wheels in the future only if Wheels would agree to be bound by the reverse side terms contained on Solar's quote sheets. Hudetz explained to Correll that he must agree to incorporate these terms into all future contracts between the two parties. On the next Wheels project packaged by Solar, a project called "High Gear I 1994," Correll signed an original quote sheet containing the reverse side terms, and he and Hudetz discussed the terms. Based on this common understanding, Solar continued to perform collating and packaging services for Wheels.

10. Beginning with High Gear I 1994, Solar packaged a total of eight different trading card products for Wheels without incident. These projects were called "High Gear I 1994," "High Gear II 1994," "Crown Jewels of Racing 1995," "High Gear 1995," "Rodeo," "Knight Quest," "Viper 1996," and "Crown Jewels Rodeo." The agreements for these projects were consummated in the following manner. The first step required Correll and Miles Atkins of Wheels to compile a specification sheet for the project. Each project had a unique array of specifications which detailed the different sets of cards, the number of different cards per set, the desired ratios of each type of card, and the total quantity of each type of card. After John Waterhouse of Solar received the specification sheet, he created a series of notes which set out in some detail how the project would be "packed out." He sent these notes back to Correll and Atkins for their review. The discussions between these individuals which followed resulted in the mutual under-

---

2. A third class of cards is known as redemption cards. These cards are found less frequently than base cards and may be redeemed for other cards.

standing as to how the project would be packaged. Thereafter, on some projects Waterhouse sent a quote sheet to Wheels, and on others he did not.

11. One aspect of the understanding arrived at by the parties involved what assortment of cards should be found when a particular box or case was opened. These requirements differed for different projects. The default rule was that the boxes and cases would contain a "random mix" of cards and sets of cards and that Solar would "strive" to meet the stated ratios for the insert cards. Conrad Powell of Wheels testified that in general the collation of cards should be "as random as possible." Waterhouse made it clear to Atkins and Correll that unless Wheels specifically requested a particular card or set of cards to be found in a given box or case, whether a consumer actually received an insert card or set of insert cards amounted to a lottery. Plaintiff's own expert, Hal Hintze, stated in his report that there is no agreed-upon standard in the industry as to whether duplication of insert cards at the case level is permissible. According to Ted Taylor, who testified as a trading card expert for Defendant, only one trading card company guarantees consumers that they will receive a full set of base cards in every box.

12. In both the High Gear I 1994 and High Gear II 1994 projects, for example, the parties agreed that some displays would contain a full set of base cards, and some would not. In the High Gear II 1994 project, there was to be one Mark Martin Signature card in every other case, four different Dominator cards per case, one Megagold card per box, and one Legend card per box. In the Rodeo project, Wheels requested that there be a full set of base cards in every box. Solar agreed that this requirement could be met with ninety-five per cent (95%) accuracy because of the small size of the base set involved. In the High Gear 1995 project, Waterhouse confirmed that if one examined an entire case, "they would get a signature card for Iceman and Kinser and the Dominator cards. The rest is left to odds." For several of the other insert cards in the High Gear 1995 project, Waterhouse emphasized that there would be an average of one card, three cards, etc., per box. In the Crown Jewels of Racing 1995 project, Waterhouse informed Wheels that receiving a complete set of base cards was "possible but not probable," but that there was to be one Goody's 300 card in every other case and one Daytona 500 card in every case. The Viper 1996 project contained a number of box-level requirements.

13. By all accounts, Wheels was fully satisfied with Solar's performance on each of these eight projects and did not receive a large volume of complaints from consumers regarding any aspect of the product.[3] There were indications, however, that Solar's collation performance was not always perfect. After the Crown Jewels of Racing 1995 project went to market, for example, Atkins sent a memorandum to Waterhouse concerning the project. Under the heading "Collation Problems," Atkins noted that there were boxes without insert cards and cases with "all of the same" insert cards, and that he had opened three boxes and still had failed to complete a set of base cards. These problems cited by Atkins did not give rise to any dispute between the parties; in fact, in a separate memorandum to Waterhouse, Powell praised Waterhouse's work on the Crown Jewels of Racing 1995 project.

14. On the first trading card product manufactured by Wheels after Race Sharks, a project called "Predator," Wheels' specification sheet included several case-level requirements. For example, Wheels requested that in every case there be eighteen complete sets of base cards (there were to be eighteen boxes per case), 2.25 complete sets of Eye of the Tiger cards (an eight-card insert set), 1.2 complete sets of American Eagle cards (a ten-card insert set), eight different Golden Eagle cards (out of a ten-card insert set), 4.5 different Gatorback cards (out of a ten-card insert set), and two Double–Eagle cards (out of a one-card insert set). These specifica-

---

3. Apparently, Wheels never systematically assessed the precision of Solar's collation and simply treated the level of consumer complaints as a barometer of the quality of collation. Powell testified at trial that "[o]f course, I was concerned about not having a random distribution of the cards, but if I didn't get many complaints it probably wasn't that much of a problem."

tions were sent to Waterhouse, although Solar ultimately did not package the product. According to Waterhouse, this was the first time Wheels specified for every type of insert card the expected number of cards to be received within a given case. Interestingly, during discussions between Atkins and Waterhouse in 1997 about problems with Crown Jewels Elite, Atkins conceded that he should have been more specific regarding case-level requirements.

### D. *Crown Jewels Elite and Race Sharks Projects*

15. Atkins sent a specification sheet for the Crown Jewels Elite project to Waterhouse in mid–1996. The format of the specification sheet mirrored that exhibited by the specification sheets used on the recently completed Wheels projects. On this sheet are set out the ratios of the insert cards for each of four series (Elite "TC", Elite Regular, Diamond Tribute, and Retail); the number of different cards within each insert set; the number of cards per pack, packs per box, and boxes per case; and the total number of cards. For the Elite "TC" series, for example, there were eighty different base set cards and eighty cards each for the sapphire and emerald parallel sets, which carried card-to-pack ratios of 1:7 and 1:13, respectively. The Garnet Dual Jewels, Amethyst Dual Jewels, and Sapphire Dual Jewels insert sets each contained eight different cards and carried ratios of 1:48, 1:96, and 1:192, respectively. There were six different Birthstones of Champions cards, which carried a ratio of 1:192. There was one Earnhardt "Seven Gems" card, and it carried the ratio of 1:384. There were ten different Gemstone Redemption cards, which carried a ratio of

1:16. The Elite "TC" series included 375 cases, sixteen boxes per case, twenty-four packs per box, and five cards per pack, for a total of 720,000 cards.

16. There was not a written quote sheet in the Crown Jewels Elite project. In addition to the instructions contained on the specification sheet described above, Atkins gave Solar several verbal specifications. These included directions regarding the foil wrap, shrink wrap, corrugate boxes, foam box fillers, etc. No additional specifications involving collation or case- and box-level requirements were given.

17. Following established practice, Waterhouse formulated a series of notes for the Crown Jewels Elite project detailing how he would pack it out. In these notes Waterhouse mentioned one case-level requirement, namely that there would be one Earnhardt "Seven Gems" card per case.[4] He also stated that there would be one gemstone insert card per box (for the Elite "TC" series).[5] In his notes, Waterhouse never discussed guaranteeing one full set of base cards in every box, or complete sets of gemstone insert cards in every case. Waterhouse testified that packaging a project to meet such box- and case-level requirements would have been more time-consuming and thus more expensive. He specifically asked Wheels officials if there were any additional box- or case-level requirements and was told that there were none. Furthermore, there were no specifications regarding duplication of insert cards within a case.[6] Packaging a job to avoid case-level duplication also adds time and cost to the project. Thus there was no express agreement on the Crown Jewels Elite project that Waterhouse would package the product

---

**4.** The ratio of one card per 384 packs converts to one card per case because there were 384 packs per case (twenty-four packs per box times sixteen boxes per case). Solar hand seeded each pack containing an Earnhardt "Seven Gems" card into each individual case. Only through this more expensive and timely process could Solar be sure that every case actually contained this insert card. For the same reason, Solar hand seeded one pack which contained some form of gemstone card into every box.

**5.** An advertisement published by Wheels included the following sentence: "But with approxi-

mately one gemstone card in every box, Crown Jewels Elite is one treasure that won't be hard to find." This was the only box- or case-level requirement mentioned in the full-page advertisement.

**6.** Waterhouse testified that during the course of the parties' relationship duplication or clustering was never discussed *per se*. Instead, the issue was addressed, if at all, only in terms of whether a full set of insert cards would appear in every case.

so that a complete set of base cards would be found in every box or that complete sets of gemstone insert cards would be found in every case. Furthermore, the parties did not expressly agree to a tolerance level of clustering or duplication of gemstone insert cards within a particular case.

18. The specification sheet for the Race Sharks project followed the same format as the specification sheet for the Crown Jewels Elite project discussed above. Waterhouse again supplied Wheels with pack-out notes for Race Sharks, and again there was no requirement that a complete set of base cards be in every box, no requirement that complete sets of insert cards be in every case, and no requirement that insert cards not be duplicated within a case. A quote sheet was sent by Solar to Wheels for this project, but it was not signed.

19. The Crown Jewels Elite project experienced several problems before it hit the market. The product was advertised for release in September 1996. But the release date did not occur until December 1996, a fact which put "tremendous pressure" on the parties involved, according to Atkins. Plaintiff's expert Hintze admitted that a late-arriving trading card product can experience significant sales problems once it hits the market. Defendant's expert Taylor stated that being three months late to the market "seriously compromises the product and sets it up for failure" as interest wanes. Plaintiff presented no evidence which supports the conclusion that the delay was attributable to conduct on the part of Solar.

Problems also arose with respect to the gemstones which were attached to the Crown Jewels Elite insert cards. The gemstones had to be re-cut to reduce their thickness, and several hundred cards had their gemstones fall off before the cards were packaged. Plaintiff presented no evidence which supports the conclusion that the problems with the gemstones were attributable to conduct on the part of Solar. In fact, the evidence reveals that Solar glued numerous gemstones back onto the cards from which they fell, in an effort to salvage as many defective cards as possible.

Finally, there were shortages of a number of the gemstone insert cards. The most severe shortages involved the Garnet Dual Jewels and Amethyst Dual Jewels cards; the shipments of these cards fell 2,978 and 1,097 cards shy of the 11,400 and 5,700 needed, respectively. Many shipments from Wheels to Solar of the other gemstone insert cards lacked the surplus five per cent requested by Solar to account for waste. Plaintiff presented no evidence which supports the conclusion that the shortages of gemstone insert cards were attributable to conduct on the part of Solar.

In the face of these problems, Atkins informed Solar personnel that they should do the best they could to complete the job as quickly as possible. Atkins conceded at trial that he instructed Solar to spread out any shortages through the production run, even though this would compromise the stated odds. According to Waterhouse, so doing caused some 3,300 boxes of Elite Regular and Diamond Tribute cards to be packaged without any gemstone insert cards. Waterhouse estimated these 3,300 boxes to comprise twelve per cent (12%) of the total number of boxes in the production run. For these 3,300 boxes Wheels hand seeded a regular pack rather than a pack containing a gemstone card.

20. Once the packaging for the Crown Jewels Elite project was completed, Wheels shipped approximately one-half (½) of the 2,100 cases to its distributors. Manufacturers sell most of their product by the case to distributors, who typically enjoy absolute return privileges. Correll testified that seventy per cent or more of Wheels' product is sold to distributors. Distributors then distribute the trading card product to hobby dealers, who typically purchase by the box. Although some dealers buy cases directly from manufacturers, most will buy boxes from distributors on a weekly or even daily basis to avoid tying up money in inventory. According to Taylor, eighty-five per cent or more of dealers buy cards by the box, and many manufacturers do not sell directly to dealers at all. Correll testified that Wheels sells about twenty per cent of its product to dealers. Most consumers of trading cards

buy packs or boxes. Taylor estimated that less than one per cent of all collectors purchase whole cases. Sometimes distributors or dealers open entire cases of cards for the purpose of building complete sets of insert cards or base cards for sale to consumers.

21. After the Crown Jewels Elite product reached the market, Wheels' customer service department received a larger volume of complaints than it had received on prior projects. Wheels employees did not verify these complaints,[7] and Plaintiff offered no evidence in the form of distributor, dealer, or consumer testimony to corroborate its claim that these complaints centered around poor case-level collation of insert cards and failure to provide a complete set of base cards in every box. In fact, Bonnie Goodin, who handled customer service at Wheels and testified on behalf of Plaintiff at trial, stated that a majority of the complaints she dealt with concerned the composition of boxes. Plaintiff's expert Hintze conceded at trial that in his deposition he had testified that Atkins identified to Hintze gemstone card shortages as the primary source of complaints. Plaintiff does not contend that clustering of insert cards existed at the box level. Ultimately, Wheels issued over $580,000.00 worth of discounts and returns on the Crown Jewels Elite product.

22. To corroborate its assertion that poor collation caused the unusually large volume of consumer complaints, Plaintiff provided at trial the testimony of Hintze, who analyzed a single case of Crown Jewels Elite. In that case, which contained sixteen boxes, Hintze documented a shortage of gemstone insert cards relative to the array of insert cards one would have expected to receive based on the stated odds. Hintze counted seven, three, and zero Dual Jewels Garnet, Dual Jewels Amethyst, and Dual Jewels Sapphire cards, where eight, four, and two were expected, respectively. Hintze also counted one Birthstones of Champions card and zero Earnhardt "Seven Gems" cards, where two and one were expected, respectively. Three of the sixteen boxes opened by Hintze lacked a complete base set, and five of the sixteen

boxes lacked a gemstone insert card. Hintze's data reveals that, of the seven Dual Jewels Garnet cards received, there were two #2 cards, one #4 card, one #7 card, and three #8 cards (from an eight-card set). Hintze's data is inconsistent with respect to the three Dual Jewels Amethyst cards he received; there were either three #5 cards or two #5 cards and one #7 card (from an eight-card set). Although Hintze's data does reflect some degree of clustering of gemstone insert cards at the case level, he does not focus on this fact in his report. According to Hintze, "[t]he primary deficiency in this product is the extreme shortage of the high-end chase card, which negatively impacts the aggregate 'value' of a case's contents after opening."

23. Plaintiff also offered evidence of a May 28, 1997, meeting at Wheels' offices at which Solar and Wheels personnel opened a case of Crown Jewels Elite Diamond Tribute cards and analyzed its contents. The parties' analysis of this case did reveal some clustering of insert cards at the case level. From the sixteen boxes opened, a total of fifteen Crown Signature Amethyst cards were received, of which there were three #3 cards, one #6 card, six #7 cards, and five #10 cards (from a ten-card set). There were four Dual Jewels Garnet cards received (of an expected eight), two #4 cards, one #6 card, and one #8 card (from an eight-card set). There were seven Diamonds in the Rough Sapphire cards received (of an expected eight), two #1 cards, two #2 cards, one #3 card, and two #5 cards (from a five-card set). There were two Dual Jewels Amethyst cards received (of an expected four), one #1 card and one #2 card (from an eight-card set). There were four Birthstones of Champions cards (of an expected two), one #1 card, one #2 card, one #4 card, and one #6 card (from a six-card set). Finally, there was one Earnhardt "Seven Diamond" card (of an expected one). The analysis thus reveals, in addition to some clustering of the Crown Signature Amethyst cards, shortages of the Dual Jewels Amethyst and Dual Jewels Garnet cards. The analysis does not indicate

---

7. One Wheels employee testified that a form was completed whenever Wheels "rectified" a complaint. No such forms were offered into evidence.

whether a complete set of base cards was found in every box.

24. Shortly before the Race Sharks product was shipped by Solar, Waterhouse opened and analyzed two cases. On February 10, 1997, Waterhouse faxed a summary of his analysis to Wheels. His data compilation revealed case-level clustering of the Shark Tooth Signature card. In the first case, Waterhouse counted one # 8 card, one # 9 card, two # 10 cards, two # 14 cards, four # 17 cards, two # 18 cards, one # 19 card, one # 20 card, and one # 23 card (of a twenty-five card set). In the second case, Waterhouse counted three # 7 cards, one # 9 card, four # 17 cards, two # 19 cards, two # 20 cards, one # 21 card, and one # 24 card. The data from the first case also revealed a shortage of Shark Attack insert cards, because only four cards were received (of an expected eight). Wheels instructed Solar to proceed with shipment of the Race Sharks product, and Solar did so on February 18, 1997. According to Atkins, on the Race Sharks project "[t]he clustering turned out not to be as damaging and as severe as it was in Crown Jewels Elite." Wheels issued a significantly smaller amount of credits and returns for Race Sharks than it did for Crown Jewels Elite, namely $46,610.00 as compared with over $580,000.00.

25. On February 18, 1997, Solar also shipped twenty extra cases of Race Sharks, even though the cases contained no Great White insert cards (of an expected four). Atkins testified that Wheels officials knew these cases would lack the Great White cards, but hoped that consumers would not detect the shortages.

26. Although Plaintiff maintains that it received complaints about clustering in the Race Sharks product, it presented no evidence in the form of distributor, dealer, or consumer testimony to support this contention. As before, Wheels did not verify the complaints it received.

27. On December 16, 1996, Solar forwarded Wheels an invoice for its performance on the Crown Jewels Elite project in the amount of $92,935.91. Solar has not received payment for this invoice. On March 3, 1997,

Solar forwarded Wheels an invoice for its performance on the Race Sharks project in the amount of $53,917.72. Solar also has not received payment for this invoice.

## DISCUSSION

### A. *Applicable Law and Standards*

As a court sitting in diversity, this court must apply the substantive law of the forum state in resolving the parties' dispute, including the forum state's choice-of-law rules. *Imperial Cas. and Indem. Co. v. Radiator Specialty Co.*, 862 F.Supp. 1437, 1440 (E.D.N.C.1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)), *aff'd*, 67 F.3d 534 (4th Cir.1995). According to North Carolina's choice-of-law rules, in a breach of contract case the law of the state where the contract was made governs issues of contract construction. *Imperial Cas.*, 862 F.Supp. at 1440 (citing *Tanglewood Land Co., Inc. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655 (1980)). Both parties make their legal arguments under North Carolina law, and neither party has argued or suggested that the law of any state other than North Carolina applies. Accordingly, the court will apply North Carolina law in reaching its legal conclusions.

Plaintiff must prove each element of its claim by a preponderance of the evidence in order to recover from Defendant. *Wyatt v. Queen City Coach Co.*, 229 N.C. 340, 49 S.E.2d 650, 652 (1948). In an action for breach of contract, the plaintiff "must prove that a contract existed, the specific provisions breached, the facts constituting the breach and the amount of damages resulting to plaintiff from such breach." *Harrington v. Perry*, 103 N.C.App. 376, 406 S.E.2d 1, 2 (1991) (citing *Cantrell v. Woodhill Enters., Inc.*, 273 N.C. 490, 160 S.E.2d 476, 481 (1968)). Plaintiff's theory in the case at bar is that Defendant breached its agreement to collate the Crown Jewels Elite and Race Sharks projects in a reasonable fashion by

failing to provide a full set of base cards in every box or by allowing case-level clustering of insert cards.[8]

### B. *Course of Dealing*

■ Plaintiff relies on the parties' course of dealing to argue that the Race Sharks and Crown Jewels Elite contracts contained the provisions which it claims Defendant breached. This reliance is necessary because, as found above, the parties did not expressly agree that for these two projects there would be a complete set of base cards in every box, a complete set of insert cards in every case, or no clustering of insert cards in any cases.

A course of dealing "is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." N.C.Gen.Stat. § 25-1-205(1) (1986).[9] Plaintiff contends that Defendant's performance on the nine prior projects established the standards for collation that Defendant agreed to meet on the Crown Jewels Elite and Race Sharks projects. This standard, Plaintiff argues, dictated that a full set of base cards would appear in every box, that there would be complete sets of insert cards in every case, and/or that there would not be clustering of insert cards at the case level to the extent allegedly found in the Crown Jewels Elite and Race Sharks projects. Plaintiff points out that a course of dealing will "give particular meaning to and supplement or qualify terms of an agreement." N.C.Gen.Stat. § 25-1-205(3) (1986).

It is appropriate to conclude that the parties' agreement contained an implied term that Defendant's collation of the trading card products would be performed in a reasonable fashion. *See Lane v. Scarborough*, 284 N.C. 407, 200 S.E.2d 622, 624-25 (1973) (citing 4 Samuel Williston, *A Treatise on the Law of Contracts* § 601B (3d ed.1961)). Such a term

is necessary to effectuate the intention of the parties in reaching their agreement. *Id.* Plaintiff's purpose for entering an agreement with Solar to collate Plaintiff's trading card product would have been wholly frustrated if Defendant had been permitted to package the product without mixing the cards in a reasonable manner. *See* 17A Am.Jur.2d *Contracts* § 379 (1991) ("The law will imply a contractual obligation and enforce it if it is a necessary implication from the provisions of the instrument...."); *see also Hudson Canal Co. v. Pennsylvania Coal Co.*, 8 Wall. 276, 75 U.S. 276, 288, 19 L.Ed. 349 (1868) ("Undoubtedly necessary implication is as much a part of an instrument as if that which is so implied was plainly expressed, but omissions or defects in written instruments cannot be supplied by virtue of that rule unless the implication results from the language employed in the instrument, or is indispensable to carry the intention of the parties into effect; ...."). There is also no evidence that implying into the contracts a term requiring Defendant to collate the products in a reasonable manner would create an inconsistency with any express term of those contracts.

■ The parties' prior dealings are appropriately used to shed light on what the parties considered to be "reasonable collation." *Cf.* N.C.Gen.Stat. § 25-1-205(3) (1986). This is the point at which Plaintiff's case begins to founder. Plaintiff did not demonstrate by a preponderance of the evidence that failure to package a full set of base cards in every box would constitute unreasonable collation. In fact, the evidence presented was to the contrary. For example, on the Rodeo project Plaintiff specifically requested that a full set of base cards be in every box, and Defendant agreed to do so with ninety-five per cent accuracy. If reasonable collation meant that every box contained a full set of base cards,

---

**8.** The existence of case-level clustering would breach two different contract terms (if these terms existed): (1) a term prohibiting clustering and (2) a term mandating that complete sets of insert cards be provided in every case. If a case contains a complete set of insert cards, it is impossible for there to be clustering of these same insert cards.

**9.** Both parties argue under provisions contained in North Carolina's Uniform Commercial Code ("UCC") regarding courses of dealing, even though neither asserts that the UCC applies to this dispute. However, according to the North Carolina Comment to Section 25-1-205, that section is "consistent with the common law of contracts in general." Thus while the UCC may not apply to this dispute, its language regarding courses of dealing is instructive.

then this express agreement would have been unnecessary. Furthermore, on several other projects Waterhouse informed officials at Wheels that some boxes would contain a full set of base cards and some would not. Plaintiff presented no evidence that this sort of statement was met with objection by Waterhouse's counterparts at Wheels or that it represented an exception to the normal manner of collation.

Plaintiff also did not demonstrate by a preponderance of the evidence that failure to provide a complete set of insert cards in every case would constitute unreasonable collation. Again the exhibits and testimony received into evidence are to the contrary. On nearly every prior project collated by Defendant, there were certain insert cards that were guaranteed by Waterhouse to be found within a given case or box. But at no point did Waterhouse suggest that every set of insert cards would be found in every case.[10] In fact, on several occasions he informed Atkins and Correll that, unless a particular element was specifically requested to be found in every case or box, then whether one actually received such a card would amount to a lottery. Waterhouse emphasized that if Wheels wanted to be certain that a particular card or set of cards would be found within a case or box, a more expensive and time-consuming procedure would have to be followed. There was no evidence that Wheels' officials objected to these sorts of statements by Waterhouse. Neither was there evidence that on the nine jobs completed prior to the Crown Jewels Elite project all cases contained complete sets of all insert cards.

Finally, Plaintiff did not demonstrate by a preponderance of the evidence that case-level clustering of insert cards to the extent alleged by Plaintiff to have marked the Crown Jewels Elite and Race Sharks projects would constitute unreasonable collation. The best evidence on this issue arose from the Crown Jewels of Racing 1995 project. After that project was completed, Atkins sent a memo-

randum to Waterhouse in which he noted several collation problems on the Crown Jewels of Racing 1995 project, one of which involved clustering. According to Atkins, there was evidence that some cases included "all the same" insert cards. At best, this evidence suggests that the parties considered a circumstance where cases contained only one insert card a number of times to be unreasonable collation. Plaintiff does not contend, however, that on the Crown Jewels Elite or Race Sharks projects cases contained only one insert card; instead, Plaintiff complains of repetition of particular insert cards within an array of insert cards received. Moreover, the allegedly unreasonable collation in the Crown Jewels of Racing 1995 project did not give rise to any dispute between the parties. In fact, Wheels officials praised Waterhouse for his performance on that project. Plaintiff presented no evidence that the parties affirmatively discussed what level of clustering was acceptable and what was not.[11]

Not only has Plaintiff failed to prove that the specific term allegedly breached was part of the parties' agreement, Plaintiff has also failed to prove this term, even if it existed, was breached by Defendant. Plaintiff offered the fact that a greater volume of complaints was received on the Crown Jewels Elite and Race Sharks projects as evidence that Defendant's collation on those projects was unreasonable. Plaintiff did not provide any evidence which directly linked the complaints received to unreasonable collation. Not one of the many distributors, hobby dealers, or consumers who allegedly complained about the collation of the Crown Jewels Elite and Race Sharks projects testified at trial. Plaintiff conceded that its employees did not verify the complaints in any manner which could be presented at trial in support of its theory of recovery. Moreover, there was compelling evidence at trial that most of the complaints in fact related to box-

---

**10.** It was only with the Predator project that Wheels described for the packager what assortment of each set of insert cards it wished there to be found in each case.

**11.** When pressed by the court, Atkins had great difficulty articulating exactly what constituted unreasonable collation or clustering, and ultimately was unable to describe the standard or explain how the parties established that standard.

level collation, complaints which could not have involved clustering of insert cards.[12]

Plaintiff offered analyses of two cases of Crown Jewels Elite product and two cases of Race Sharks product as evidence of breach. Plaintiff's own expert Hintze stated in his report that the most troubling problem in the case of Crown Jewels Elite he opened was a shortage of gemstone insert cards in individual boxes. Although there was some clustering of gemstone insert cards at the case level, Hintze did not focus on this fact in his report. Hintze also observed that thirteen of the sixteen boxes in the case contained a full set of base cards. In the case of Crown Jewels Elite opened by the parties on May 28, 1997, there again existed some clustering of gemstone insert cards. But as was seen in the case opened by Hintze, the clustering observed was not so severe that only one particular insert card was received multiple times. The parties did not record whether a full set of base cards was received in every box. In the two cases of Race Sharks opened by Solar employees, again case-level clustering of insert cards existed to a degree comparable to that observed in the two Crown Jewels Elite cases analyzed. Data regarding base card collation per box was not recorded.[13]

In light of the evidence and testimony received at trial, the court cannot conclude that Plaintiff has proven by a preponderance of the evidence that Defendant breached the contracts. As alluded to above, it appears just as likely, and arguably even more likely, that some combination of delay, defective

gemstones, and shortages of gemstone insert cards generated the larger volume of complaints over Crown Jewels Elite.[14]

## CONCLUSIONS OF LAW

1. The parties' course of dealing established that, on the Crown Jewels Elite and Race Sharks projects, Solar agreed to collate the trading card product in a reasonable fashion.

2. Wheels has not demonstrated by a preponderance of the evidence that the parties' course of dealing established that "reasonable collation" meant that there would be no clustering of insert cards in any cases, that there would be complete sets of insert cards in every case, or that there would be a complete set of base cards in every box.

3. Wheels has not demonstrated by a preponderance of the evidence that clustering of insert cards existed in every case or most cases of Crown Jewels Elite or Race Sharks product, that every case or most cases lacked complete sets of insert cards, or that every box or most boxes lacked a complete set of base cards.

4. Wheels has not demonstrated by a preponderance of the evidence that any shortages of cards, delays in production, or defects in the attached gemstones which plagued the Crown Jewels Elite project were attributable to conduct on the part of Solar.

5. Solar is entitled to judgment on Wheels' breach of contract claims.

12. This follows because there was to be only one gemstone insert card per box.

13. Interestingly, although the clustering in the two Race Sharks cases mirrored that observed in the two Crown Jewels Elite cases, Wheels officials conceded that the volume of complaints received over Crown Jewels Elite far exceeded that received over Race Sharks. The fact that over ten times the dollar amount of returns and credits were issued by Wheels for the Crown Jewels Elite product as compared with the Race Sharks product bears out Wheels' concession. If any conclusion at all is to be drawn from the composition of the four cases offered by Plaintiff, it may well be that some factor other than case-level clustering accounts for the large volume of complaints received over Crown Jewels Elite, a

factor which marked that project but not Race Sharks. There was evidence to suggest that delay, defective gemstones, and shortages of certain gemstone insert cards plagued the Crown Jewels Elite project, but not the Race Sharks project. The latter two factors would give rise to box-level, rather than case-level, complaints, a fact which is consistent with Bonnie Goodin's and Hintze's testimony that most Crown Jewels Elite complaints regarded the composition of boxes.

14. Because Plaintiff failed to demonstrate that the term allegedly breached existed, or that this term if in existence was breached, it is unnecessary for the court to address Defendant's theory that the "Printing Trade Customs" contained on the reverse side of Defendant's quote sheets provide Defendant with a defense to this action.

6. Solar demonstrated by a preponderance of the evidence that it performed its obligations under the applicable contracts to cut, collate, and package the Crown Jewels Elite and Race Sharks trading card products for Wheels.

7. Solar is entitled to judgment on its breach of contract counterclaim against Wheels, and Solar shall have and recover $146,853.63 on its counterclaim, that is $92,935.91 for the Crown Jewels Elite project and $53,917.72 for the Race Sharks project. Solar shall also have and recover pre-judgment interest at the statutory rate of eight per cent (8%) from January 22, 1997, on the Crown Jewels Elite invoice and from April 6, 1997, on the Race Sharks invoice. N.C.Gen. Stat. §§ 24–1, 24–5.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.